**MEAD JOHNSON & COMPANY, Plaintiff,**

v.

**ABBOTT LABORATORIES, Defendant.**

**No. EV 98–131–CH/H.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 18, 1999.

Order Modifying Opinion
April 13, 1999.

Patrick A. Shoulders, Ziemer, Stayman, Weitzel & Shoulders, Evansville, Indiana, for Plaintiff.

Thomas C. Morrison, Patterson Belknap Webb & Tyler, New York City, for Defendant.

## ENTRY ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

HAMILTON, District Judge.

### Introduction

Defendant Abbott Laboratories advertises its Similac line of infant formulas under the banner "1st Choice of Doctors." Abbott's chief competitor in the infant formula market is plaintiff Mead Johnson & Company. Mead Johnson contends that the "1st Choice of Doctors" claim is false and/or misleading and thus violates Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1). Mead Johnson contends the claim is misleading because consumers interpret it to mean that most doctors believe Abbott's product is medically superior to Mead Johnson's product, when in fact most doctors do not have a preference between the two leading brands and there is no evidence that one product is medically superior to the other. Mead Johnson seeks a preliminary injunction to stop Abbott from continuing to advertise with the "1st Choice of Doctors" claim.

The court held an evidentiary hearing on November 23–25, 1998. Pursuant to Rules 52 and 65 of the Federal Rules of Civil Procedure, the court now states its findings of fact and conclusions of law.[1] As explained below, the court finds that Mead Johnson has shown a substantial likelihood of prevailing on its claim that "1st Choice of Doctors" misleads consumers with respect to Similac in two independent ways. The market research on doctors' views of the competing brands is not consistent with consumers' actual and reasonable in-

---

1. The court's resolution of the motion for preliminary injunction was delayed for about six weeks as a result of a disqualification issue addressed in the court's entry of February 22, 1999.

terpretations of the "1st Choice of Doctors" claim in two ways. First, consumers reasonably interpret the claim to mean that a majority of doctors choose Abbott products over Mead Johnson products. A fair reading of the many doctor surveys in question shows that Abbott products consistently gain the support of only a plurality of doctors. Second, consumers reasonably interpret the "1st Choice of Doctors" claim to mean that doctors base their choices on professional judgments about the relative quality of the products. The surveys that Abbott offers in support of the claim were not designed to elicit a doctor's exercise of professional judgment as distinct from a "top of the head" product or advertising recall. Because the other equitable factors also weigh in favor of injunctive relief, the court grants Mead Johnson's motion for preliminary injunction and will enjoin continued misleading advertising using the "1st Choice of Doctors" claim for Abbott's Similac brand. The relief will not extend, however, to Abbott's soy-based brand Isomil, as to which Mead Johnson has not shown the claim is misleading.

The facts in the case are voluminous, including evidence of numerous market research surveys of doctors and consumers who buy infant formulas. The evidence may be more readily understood if the court first lays out the legal framework that applies to Mead Johnson's motion for a preliminary injunction under the Lanham Act claim.

## I. *Preliminary Injunction Standard*

In another recent Lanham Act case involving these same parties, the Seventh Circuit set forth its definitive standard for deciding motions for preliminary injunctions:

As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties.

The court, sitting as would a chancellor in equity, then "weighs" all four factors in deciding whether to grant the injunction, seeking at all times to "minimize the costs of being mistaken." We call this process the "sliding scale" approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992) (vacating denial of preliminary injunction where Abbott showed likelihood of succeeding on merits and court should have presumed irreparable harm from deceptive comparative advertising) (citations omitted).

## II. *Likelihood of Success on the Merits*

Section 43(a) of the Lanham Act provides in relevant part:

(1) Any person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

\*      \*      \*      \*      \*      \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another per-

son's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a). This provision of the Lanham Act has become the principal legal vehicle for one competitor to challenge another's advertising as false, misleading, and/or deceptive.

■ The prohibitions of Section 43(a)(1)(B) apply "with equal force to (1) statements which are literally false and (2) statements which, while literally true or ambiguous, convey a false impression or are misleading in context, as demonstrated by actual consumer confusion." *Abbott Laboratories,* 971 F.2d at 13 (collecting cases); accord, *BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1089 (7th Cir. 1994); *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222, 228–29 (3d Cir.1990); *Avis Rent A Car System, Inc. v. Hertz Corp.,* 782 F.2d 381, 386 (2d Cir.1986); *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 277 (2d Cir. 1981).[2]

■ Mead Johnson has not tried to frame its case in terms of "literal falsity." As explained in detail below, the claim "1st Choice of Doctors" is deeply—and almost ingeniously—ambiguous. As a result, Mead Johnson must prove first what messages consumers actually receive when they are exposed to the "1st Choice of Doctors" claim. In the advertising business, these received messages are often called the "takeaway." Mead Johnson must prove next that the messages are false or misleading.

Mead Johnson contends that Abbott's "1st Choice of Doctors" claim is misleading because it conveys two false messages to consumers: first, that a substantial majority of doctors prefer Abbott's products over Mead Johnson's and other competitors' products, and second, that doctors prefer Abbott's products because they are medically superior for infants. Mead Johnson contends the first message is false because market surveys of physicians show consistently that fewer than half of physicians have a preference for Abbott's products over competitors' products, and that a significant proportion of physicians have no preference among the competing products. Mead Johnson contends the second message is false because the available medical evidence shows that both Abbott's and Mead Johnson's products provide excellent nutrition to infants, and neither has been shown to produce clinically better results than the other.

Abbott correctly concedes that its "1st Choice of Doctors" claim implies the existence of market research to support the claim. Abbott Br. at 17; see also *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.,* 131 F.3d 430, 436 (4th Cir.1997) (whether claim of superiority implies survey or tests results to support claim is a question of fact). The "1st Choice of Doctors" claim plainly implies the existence of supporting survey data. The parties have presented a large quantity of evidence, especially concerning doctors' views on competing infant formula products. In evaluating Mead Johnson's likelihood of success on the merits, the court addresses that evidence as follows: (1) the infant formula market and the parties' products; and (2) marketing of infant formulas, focusing especially on the role of doctors in the marketing. The court then turns to: (3) Abbott's use of the "1st Choice of Doctors" claim in its advertising; (4) the evidence of consumers' perceptions of the claim; and (5) the evidence of market research among physicians relevant to the claim.

### 1. *Infant Formulas: The Market and the Products*

Each year approximately 3.8 to 3.9 million babies are born in the United States.

**2.** In *Abbott Laboratories* the Seventh Circuit referred to Section 43(a)(2). A later amendment to Section 43 put the operative language into Section 43(a)(1)(B).

About 3.4 million of them will be fed significant amounts of infant formula in their first year of life. III Tr. 172. Plaintiff Mead Johnson and defendant Abbott manufacture and sell roughly 90 percent of all the infant formula sold in the United States. I Tr. 26. Total annual sales in the market are greater than $2 billion. See Ex. 506 at D04492; see also Ex. 14.

Defendant Abbott Laboratories operates its Ross Division, which manufactures and sells a family of infant formula products. The flagship brand is Similac, which is sold in a version "with iron" and a version with "low iron." Abbott also sells Isomil, a soy-based formula used for infants who do not tolerate milk products, as well as other specialty infant formulas.

Plaintiff Mead Johnson manufactures a competing family of infant formulas. Its flagship brand is Enfamil, which it similarly sells in a version "with iron" and another with "low iron." Mead Johnson's family of products also includes a soy-based formula called ProSoBee, a lactose-free formula called Lactofree, and other specialty infant formulas.

All witnesses in this case agree that both parties' products are high quality and provide excellent nutrition for infants. No one contends that the formulas are quite as good as human milk, but the manufactured formulas generally produce excellent results in terms of growth and development of infants. See also III Tr. 172 (at age of four to five months, only 10 to 15 percent of infants in the United States are exclusively breast-fed).

There are some differences in the parties' products. As between the flagship brands—Similac and Enfamil—Abbott and Mead Johnson use different mixtures of whey and casein as their principal protein sources. They also use different combinations of fats. More recently, in 1997 both companies began adding so-called free nucleotides to the formulas, and they do so in different proportions.

Abbott's chief doctor, William C. MacLean, Jr., testified about some reasons he believes Abbott's Similac is better than Mead Johnson's Enfamil. Two points are critical concerning that testimony. First, Abbott categorically denies making any explicit claim to medical superiority, as Dr. MacLean repeatedly acknowledged. Second, Abbott makes no claim to medical superiority because it could not support such a claim with scientific evidence. There is no scientific evidence showing a clinically significant difference between these products, whether in terms of long-term or short-term health, growth, and development of infants.

On the absence of evidence showing a clinically significant difference, the testimony of Dr. Samuel Fomon was highly credible. Dr. Fomon is a physician with great expertise in infant nutrition. He wrote the authoritative book in the field used by scientists from both companies. Although Dr. Fomon testified as an expert for Mead Johnson in this case, he operates independently of both companies and both companies have turned to him for research and advice. The court credits his evaluation of the medical research.

This is not to say that differences between the formulas might not eventually turn out to be medically significant. For marketers of each company, proof of such a difference would be professionally equivalent to the discovery of the Holy Grail or the coming of the Apocalypse, depending on which product turned out to be better. Well-financed research teams for both Abbott and Mead Johnson have been trying for years to prove that one product is clinically better than the other. Neither has succeeded to date.

2. *The Marketing of Infant Formulas and the Role of Doctors in Marketing*

The United States market for infant formulas has two distinct segments, the "WIC" and the "non-WIC" markets. The WIC program, an acronym for Women,

Infants, and Children, is a program funded by the federal government to promote nutrition among pregnant and nursing women, infants, and young children by subsidizing the purchase of nutritious foods for those who cannot afford ample nutrition. See generally 42 U.S.C. § 1786. WIC contracts in most states are handled on a sole-source basis, with the source selected on the basis of sealed bids, so that price competition is critical in choosing among otherwise acceptable products. Mothers and infants in the WIC program do not have a choice about the brand of formula that is subsidized. Mead Johnson currently has an edge in the share of the WIC market. The WIC program includes nearly half the infants born in the United States. I Tr. 26; Ex. 14.

In the non-WIC market, where consumers are free to choose among the competing brands, Abbott has had the edge in recent years in terms of market share, but Mead Johnson has been gaining. The parties' market research has produced conflicting results as to which company currently has the lead in that market. The court need not and does not make a finding on that point. In the non-WIC market, both Abbott and Mead Johnson use highly sophisticated marketing and sales techniques, and appear to compete vigorously. Both have medical research programs aimed at developing improved products and gaining a competitive edge.

Both Abbott and Mead Johnson focus their marketing efforts in the non-WIC market on doctors and other health care professionals. Abbott and Mead Johnson also use direct advertising to consumers (expectant mothers and mothers of newborn infants), plus advertising and marketing efforts directed at major retailers to secure channels for retail distribution with prominent product placement.

Abbott and Mead Johnson agree that doctors have significant influence over their patients' brand selections of infant formula. See, e.g., II Tr. 278–79 (Abbott's Gottenborg: more than half of mothers are influenced by doctor recommendations); Ex. 17 at A047702 (doctor recommendations have a powerful influence on brand choice); Ex. 43 (Abbott promotion to retailers stating that doctor's recommendation is strongest influence on brand choice); I Tr. 50–51 (Mead Johnson's McCabe: doctor recommendation is the strongest advertising message in the market and sells more product than any other message); III Tr. 85 (Abbott's market research expert Dr. McDonald: "no doubt that's one of the most powerful claims that can be made *** it's a very powerful claim. And obviously it's used as often as manufacturers can legitimately substantiate it."). The infant formulas are treated like medical products, and especially first-time mothers may not be confident that they know enough to make a good decision for their babies. Both Mead Johnson and Abbott view new mothers as emotionally vulnerable, especially with the birth of their first children. See I Tr. 33 (Mead Johnson's McCabe: first time mothers "seek out someone with authority to help them make those choices"); Ex. 43 (Abbott promotion to retailers: "high emotional significance of purchasing infant formula products"); III Tr. 85 (McDonald: doctor's ratification of brand choice relieves consumer of worrying about choice).

Both competitors direct major market research efforts to understand the interactions between doctor and new mother. Both competitors pursue major marketing and advertising programs to influence those interactions. The doctor's influence on brand selection is important both when the doctor makes an express recommendation (of one brand or more than one brand) and when the doctor gives her approval to the patient's selection, as when a patient asks her doctor: "Is it all right if I use [Brand A]?" and the doctor says yes. Also, Abbott and Mead Johnson strive mightily to have hospitals and doctors distribute free samples of their products to new mothers. The doctor or hospital staff may not perceive distribution of free sam-

ples as a recommendation, but market research shows that mothers perceive it as such. See, *e.g.,* I Tr. 29–30 (McCabe); see also Ex. 469 at B2328 (recommendations and samples from doctors and hospitals have significant influence on brand selection).

In the past, doctors often made specific brand recommendations to their patients. In recent years, however, fewer and fewer doctors have been recommending one particular brand with a high degree of frequency. Most doctors perceive both Abbott and Mead Johnson products as high quality and suitable for infants, which is consistent with the available medical evidence summarized above. Those doctors generally either make no brand recommendation or recommend two or more brands. Mead Johnson and Abbott agree that doctors have become less willing to direct their patients to one specific brand of infant formula. See, *e.g.,* I Tr. 28 (Mead Johnson's McCabe); Ex. 73 at A016286 and A016290 (Abbott market research); Ex. 74 at A050734 (same). As doctors have become more passive in brand selection, mothers have become more active in the product choice, so both companies have increased their advertising aimed directly at new mothers. I Tr. 28–29 (McCabe).

### 3. Abbott's Use of the "1st Choice of Doctors" Claim

Abbott features the "1st Choice of Doctors" claim prominently in its advertising, marketing, and packaging. Abbott places a blue flag with the words "1st Choice of Doctors" on all its infant formula product labels. That specific phrasing first appeared late in 1995. Abbott had included similar claims, such as "First choice of more physicians," on earlier labels beginning in 1989. See Exs. 405 & 406. The uncontradicted testimony of Mead Johnson's McCabe shows that Abbott recently has been increasing the amount of money it spends to promote the "1st Choice of Doctors" claim. See I Tr. 55–56.

Mary Gottenborg is the group product director for Abbott's line of infant formulas and is responsible for the overall marketing of the products. She described Abbott's marketing program for infant formulas. She described the first step as developing a "brand vision," a long-term goal for the product brand. The next step is to develop a "brand positioning statement," which is a summary of what the marketer wants to communicate to consumers about the product. The brand positioning statement then helps the marketer identify potential advertising claims for the product that might be included in advertising for the product. II Tr. 256–57.

Gottenborg testified that the brand positioning statement for Similac has three components. The first is that "we are the first choice formula of doctors." The second is that "we help babies grow and develop." The third is that "by feeding Similac, we want mothers to have trust and confidence in our product." II Tr. 260. All advertisements should be consistent with the brand positioning statement. *Id.* Because the "1st Choice of Doctors" claim reflects all three components of the brand positioning statement, Abbott has featured it prominently in advertising for Similac and the other Abbott infant formulas.

Exhibit 22 is a March 1998 report to Abbott on a test of consumer reactions to several informational advertising pamphlets on Similac. Among six pamphlets, the one stressing the "1st Choice of Doctors" claim scored highest in terms of consumers' likelihood of purchase. II Tr. 273; Ex. 22 at A022986. The report concluded: "Doctor recommendations and the 'science' behind the formula appeared to drive purchase interest for this concept, as well as the other concepts tested," and use of similar pieces emphasizing the claim was "highly recommended." Ex. 22 at A022983. The advertisement scored very high in terms of convincing consumers that Similac "is the formula doctors prefer." Ex. 22 at A022990.

That market research led to the development and use of Exhibit 39, Abbott's direct consumer advertising piece that leads with the "1st Choice of Doctors" claim. III Tr. 13. The piece then links the "1st Choice of Doctors" claim directly to a mother's desire for "only the best for your baby," and then emphasizes that "doctors know the science of good nutrition." The message and linkage between doctor preference and superior quality are plain.

Abbott also uses the "1st Choice of Doctors" claim in advertising directed at doctors, hospitals, and retailers. See Exs. 38, 43; II Tr. 261, 269 (Gottenborg); I Tr. 52 (McCabe).

### 4. Consumer Perception of the "1st Choice of Doctors" Claim

Lanham Act cases charging false or misleading advertising turn on the messages conveyed by the advertising claims in question. Where the plaintiff contends a claim is misleading but not literally false, the plaintiff must prove what messages consumers actually receive from the advertising.

### (a) Abbott's Evidence on the Message Conveyed

Abbott's group product director Mary Gottenborg testified that Abbott intends the advertising claim "1st Choice of Doctors" claim to communicate "trust and confidence in the brand." II Tr. 261. She explained that Abbott wants to convince mothers that they can have trust and confidence in the brand because its products are the "first choice of doctors." II Tr. 266. "Our intent on communication in this piece was the same as it is on our label; that is, it's the first choice of doctors and we want to convince mothers that they can have trust and confidence in using our brand." Id. Gottenborg testified that Abbott viewed the claim as "straightforward," and that being the "first choice of doctors" implies "trust and confidence"—that is "the take-away that one should perceive from it." II Tr. 281. She later added that

the "1st Choice of Doctors" claim "conveys a special sense of confidence." II Tr. 298.

The court does not agree that the meaning of the "1st Choice of Doctors" claim is straightforward or self-evident. For example, does the claim refer to all types of doctors in all types of practices, or to some particular types of practices? More to the point here, does "1st Choice" refer to nearly all doctors, a substantial majority of doctors, a bare majority of doctors, or perhaps only a bare plurality of doctors? How, if at all, does the claim take into account the possibility that many doctors have no "choice" or preference among the top brands? At a more fundamental level, what does the claim mean by "choice?" Does it refer to a doctor's exercise of her professional judgment on behalf of patients, or does it refer to a more superficial brand recognition or top-of-the-head impression about brands?

Abbott's assertion that it intends to communicate "trust and confidence" raises as many questions as it answers. Why should consumers perceive "trust and confidence" from the "1st Choice of Doctors" claim? Abbott agrees that the claim is one of the most powerful it could use in marketing infant formulas. III Tr. 85 (McDonald). Why should that be so? One possible answer is that consumers expect doctors to have used their professional judgment in making any "choices" among competing brands. As Dr. McDonald testified, the claim "says to consumers that a professional who is knowledgeable has ratified it [the choice of brand] and, therefore, allows a consumer not to think anymore about it." Id. Also, unlike a blander, noncomparative claim such as "trusted by doctors" (see Ex. 417—Enfamil advertisement for "the formula mothers and doctors have trusted for nearly 100 years"), Abbott's claim to be "1st Choice of Doctors" is an inherently comparative (actually, a superlative) claim. Abbott's assertion that it seeks to communicate trust and confidence simply overlooks the comparative or superlative nature of its claim. See III Tr. 85

(McDonald acknowledging that some consumers may interpret the claim as a claim to be "better").

Although Abbott acknowledges that its ubiquitous "1st Choice of Doctors" advertising claim is a powerful claim, Abbott itself has undertaken no consumer surveys to test the actual "takeaway" of the claim. That is, Abbott has not presented any direct evidence that the actual takeaway is the "trust and confidence" message Abbott says it intends to communicate.

### (b) Dr. Ross Survey of Consumers

At the preliminary injunction stage, Mead Johnson was not required to come forward with "full-blown consumer surveys" to prove actual consumer confusion. See *Abbott Laboratories v. Mead Johnson,* 971 F.2d at 15 (upholding district court finding of likely actual consumer confusion at preliminary injunction stage even though Abbott had not conducted such surveys); accord, *United Industries Corp. v. Clorox Co.,* 140 F.3d 1175, 1183 (8th Cir.1998). In this case, however, Mead Johnson has conducted a systematic survey of consumers' actual "takeaway" from the "1st Choice of Doctors" claim. That survey was conducted by Dr. Ivan Ross, who was employed by Mead Johnson's attorneys to conduct such a study. It is the only systematic study of consumers' actual perceptions of Abbott's claim. The results, set forth in Exhibit 1, are central to this case.

Dr. Ross supervised a survey of consumers through face-to-face interviews at shopping malls in 16 cities across the United States. Participants were screened so as to be women between the ages of 18 and 44 who either had purchased infant formula in the last three months or intended to purchase infant formula within the next 12 months for one or more of their own children. Women in the WIC program were excluded from the survey because they ordinarily are permitted no meaningful brand choice. Dr. Ross used a face-to-face survey because the participants were asked to respond to a "visual stimulus," a sample package of Abbott's Similac with the blue flag stating "1st Choice of Doctors." Neither the interviewers nor the participants were told the purpose or the sponsor of the survey.

For the first question to each participant, the interviewer pointed to the blue flag on the label claiming "1st Choice of Doctors" and then asked: "Please tell me what you understand this part of the label to communicate to you." Ex. 1, Tab A at A–4. The interviewer recorded the response verbatim, then continued to probe: "Anything else that communicates to you?" The interviewer was instructed to probe, that is, to repeat the "anything else" question, until the response was "unproductive," meaning the respondent said "no," or "nothing else." Some respondents were asked that question several times. If the respondent answered by essentially repeating or "playing back" the words "first choice," the interviewer was then instructed to ask "what do you mean by that?" or words to that effect. See II Tr. 204.

The second question was a further follow-up: "Although you may already have mentioned this, what do you understand the wording 'first choice' to communicate to you?" The interviewer was again instructed to probe until the response was "unproductive."

The third question asked: "And although you may already have mentioned this, if you have an opinion, what reason or reasons do you think this product was 'first choice of doctors'?" The interviewer was again instructed to probe for additional reasons until the response was "unproductive." The interviewer then asked "why do you say that?" and probed the response once with: "Any other reasons you say that?" Ex. 1, Tab A at A–5. The fourth question asked the participants about the types of doctors referred to in the "1st Choice of Doctors" claim.

The survey then probed a central problem posed by doctors' approaches to these competing brands—the fact that a sub-

stantial proportion of doctors have no significant preference between them. The fifth question asked: "Now, suppose that a survey of doctors had been conducted by the company which makes this product and that they were relying on the results of that survey to make the statement you see here ["1st Choice of Doctors"]. If you have an opinion, in order for this statement ["1st Choice of Doctors"] to be true, what percent of those doctors would have had to say this product was their first choice?" Interviewers were instructed to probe once: "And why do you say that." Responses were recorded verbatim. See Ex. 1, Tab A at A-7.

The sixth question went a step farther. The interviewer handed the participant a card showing:

DISPLAY CARD FOR POSSIBLE SURVEY OF DOCTORS
QUESTION: What brand of infant formula, if any, is your first choice?
RESULTS:

| | | |
|---|---|---|
| 50% | — | Said they had no first choice |
| 30% | — | Said Similac was their first choice |
| 20% | — | Said another brand was their first choice |
| 100% | — | Total doctors surveyed |

Ex. 1, Tab A at A-20. The interviewer then asked: "Suppose that in that possible survey, the doctors were asked, 'what brand of infant formula, if any, was your first choice?' And suppose that the results were that 50 percent of the doctors said they had no first choice, 30 percent said Similac was their first choice, and that 20 percent said their first choice was another brand. If those were the results of the survey, would you say that this statement ["1st Choice of Doctors"] is accurate or would you say that this statement is not accurate, or don't you have an opinion about that one way or the other?" Ex. 1, Tab A at A-7.[3] Interviewers probed with "why do you say that?" Id.

Because several questions were open-ended and responses were recorded verbatim, Dr. Ross had to "code" the responses. Dr. Ross and an associate separately coded all responses and then compared their results as a means of quality control. The final results reflect the reconciled coding after Dr. Ross and his associate compared their results.

In response to the first question about what the claim "1st Choice of Doctors" communicated, 52.6 percent of respondents gave answers that Dr. Ross and his associate coded as a reflection of qualitative superiority: superior, better, best, etc. Ex. 1, Tables at T-3. Abbott's market research expert criticized this calculation because Dr. Ross included answers referring only to doctors' "preferences." The criticism was valid because a consumer perception of doctor "preference" does not necessarily show that the consumer perceived the preference in terms of a view of product quality. In response to the criticism, Dr. Ross did a new calculation showing that if the answers referring only to doctors' "preferences" are subtracted, as they properly should have been, the relevant figure is that 41.3 percent understood the claim as making some claim of superiority. See II Tr. at 200-02; Ex. 114, Table 9.[4]

3. To avoid possible bias resulting from the order of the choices, the questions to half the participants posed "accurate" as the first option and half posed "not accurate" as the first option.

4. Federal courts have not established a numerical benchmark for determining when a claim is misleading for purposes of the Lanham Act. Circuit courts have written in terms of deceiving "a substantial portion of the intended audience," U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 922 (3d Cir.1990), and deceiving "a not insubstantial number of consumers." Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir.1982); see also William H.

In response to questions about doctors' reasons for choosing Similac, Dr. Ross found that 54.9 percent of participants responded in terms of the quality of the product and/or superiority to other products. Ex. 1, Tables at T–7. The Ross survey did not differentiate between claims of long-term medical superiority defined by clinically proven results, which is the standard Mead Johnson contends is relevant, and less dramatic claims of short-term convenience and tolerance effects. See II Tr. 198–99.

In response to the fifth question about how many doctors would need to have identified Similac as their "first choice" for the statement to be true, 84 percent of the respondents said it would have to be more than 50 percent of doctors. Ex. 1, Tables at T–1. Only 1.4 percent of respondents gave answers of less than 50 percent as supporting the claim. *Id.*

The sixth question introduced the hypothetical survey in which 50 percent of doctors had no preference, 30 percent preferred Similac, and 20 percent preferred another brand. That question therefore introduced to participants the problem posed by those doctors having no preference and the possibility of a plurality of doctors preferring Similac. In response to the sixth question, 64.8 percent of respondents said those results would make the "1st Choice of Doctors" statement not accurate, while 19.8 percent said the statement would be accurate, and 15.4 percent had no opinion. Ex. 1, Tables at T–9.

Dr. Ross concluded from the results of his study that more than 80 percent of the consumers understood the "1st Choice of Doctors" claim to convey that a majority of doctors choose or prefer Similac. Ex. 1 at 23. He also concluded that more than 40 percent understood the claim as making some claim of product superiority. With respect to the issue of doctors' reasons for choosing or preferring Similac, more than half attributed doctors' reasons to the doctors' views of the quality or superiority of the product. More than 90 percent of those respondents who expressed any opinion about doctors' likely reasons for their choices thought that the doctors' opinions would be based on product quality or performance.

Abbott criticizes the Ross consumer survey on several major grounds. Abbott contends that the Ross survey used excessive probing, which can introduce biases into a study by forcing responses from a person who has no meaningful response to give. Second, Abbott criticizes the attempt to ask consumers to speculate about why doctors might choose Similac over other brands. Third, Abbott criticizes the attempt to have consumers quantify the proportion of doctors who would have to choose Similac for the "1st Choice of Doctors" claim to be true. The court is not persuaded by these criticisms.

First, probing was appropriate here because of the ambiguity of the "1st Choice of Doctors" claim. In market surveys

*Morris Co. v. Group W, Inc.,* 66 F.3d 255, 258 (9th Cir.1995) ("deceived a significant portion of the recipients"); *Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297–98 (2d Cir.1992) (requiring plaintiff to demonstrate that "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement"); cf. *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 19 F.3d 125, 133–34 (3d Cir.1994) (tendency to deceive 7.5% of consumers was not sufficient to prove deception). District courts have found a tendency to deceive where sur-

veys indicated that a substantial minority of consumers was likely to be misled. See, e.g., *Stiffel Co. v. Westwood Lighting Group,* 658 F.Supp. 1103, 1114 (D.N.J.1987) (potential that between 22% and 57% of consumers will be misled is not insubstantial); *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.,* 511 F.Supp. 867, 876 (S.D.N.Y.1980) (deception rate of between 23% and 33% sufficient to warrant preliminary injunctive relief); *McNeilab Inc. v. American Home Products Corp.,* 501 F.Supp. 517, 527 (S.D.N.Y.1980) (23% not insubstantial number of consumers). In this case, the tendency to deceive more than 40 percent of consumers is substantial.

probing can be a powerful tool, but it can also introduce biases and produce artificial responses from a participant who has run out of meaningful ideas on a subject. Compare *L & F Products v. Procter & Gamble Co.*, 845 F.Supp. 984, 996 (S.D.N.Y.1994) (repeating questions "also serves the purpose of clarifying otherwise ambiguous first responses by probing the implications of previous answers"), *aff'd*, 45 F.3d 709 (2d Cir.1995), with *American Home Products Corp. v. Procter & Gamble Co.*, 871 F.Supp. 739, 748 (D.N.J.1994) (excessive probing undermined credibility of survey evaluating arguably implicit messages); see also *Johnson & Johnson–Merck Consumer Pharmaceuticals*, 19 F.3d at 133–34 & n. 13 (Dr. Susan McDonald defended survey using repeated probes against attack based on "excessive probing"). Mead Johnson has the burden of showing what consumers understand that claim to mean. A more directive approach would no doubt have been criticized as introducing other biases into the study. Repeated probing was a fair means of determining the "takeaway" from the claim.

Also, Abbott's criticism of the probing rings a little hollow. An advertiser is responsible for both explicit messages in advertising and implicit messages communicated to a reasonable proportion of the audience. Abbott itself has not undertaken any study of the message or "takeaway" that consumers draw from the "1st Choice of Doctors" claim. The National Advertising Division of the Better Business Bureau (the "NAD") provides an informal and voluntary forum for resolving disputes over advertising, and the parties here have cited its decisions as persuasive authority. The NAD has taken the approach that an advertiser is responsible for supporting "any reasonable interpretation of its claims in an advertisement." *Church & Dwight Co.*, NAD Case Reports 11/85 213, 215. The Advertising Research Foundation similarly emphasizes the need for determining consumers' perceptions (or "takeaway" in the jargon) from advertising

claims. See II Tr. 55–56; Ex. 25. The same responsibility is the foundation of the court decisions recognizing that an advertiser may be found liable for the implied messages or claims in advertising if consumers understand those claims in ways that make them misleading or deceptive. *E.g., Abbott Laboratories*, 971 F.2d at 13; *Sandoz Pharmaceuticals v. Richardson–Vicks*, 902 F.2d at 228–29; *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d at 386; *Vidal Sassoon v. Bristol–Myers Co.*, 661 F.2d at 277. Abbott's criticism on this score might have more force if Abbott had offered some conflicting evidence tending to show consumers do not infer something about product quality from the "1st Choice of Doctors" claim. It has offered no such evidence.

Abbott's second criticism—that Dr. Ross invited consumers to speculate about why doctors might prefer Similac—is also unpersuasive. See III Tr. 86–87 (McDonald). Some doctors may have brand preferences for reasons that have nothing to do with product quality. Perhaps they prefer the service from one brand's sales representative, perhaps they like one company's support for medical research, or perhaps they have any of a variety of other reasons for their preferences. See, *e.g.,* Ex. 2 at Tab C–29 to C–34 (some verbatim responses from doctors about reasons for preferences); Ex. 456 at PAR00216 (good service and rapport with representative cited by doctors more often than other reasons for preferring Similac).

In the court's view, however, it is perfectly obvious to all the marketing and market research witnesses who testified that the reason the "1st Choice of Doctors" claim is so powerful is that many *consumers* assume that such preferences are based on doctors' professional judgments about product quality. The NAD similarly recognizes that professional recommendations of health-care products are powerful because consumers interpret them as based on professional assessments of prod-

uct quality. See *Denmat Corp.,* NAD Case Reports ⁷⁄₈₆ 156, 161 (dental hygienists' recommendation of toothpase: where hygienists are presented as experts, their "evaluation and selection of a certain product is expected to be an expression and exercise of their expertise"); *Braun, Inc.,* NAD Case Reports ⁹⁄₈₄ 18, 20 ("When dental professionals are given competing products to use under the same circumstances and asked a limited question, *i.e.* which, if either, they prefer, it can be assumed that professional expertise has been exercised in the comparison and expression of preference (if any)."); see also *Church & Dwight Co.,* NAD Case Reports ¹¹⁄₈₅ 213, 215 (advertisement linking product feature to dentists' recommendation did not support claim where survey of recommendations did not show that the feature was the reason for the recommendations). Dr. Ross's questions on the perceived reasons for doctors' choices were less an invitation to speculate than a means of confirming what is common wisdom among those in the business. The strength of that wisdom is confirmed by the fact that, among consumers who offered an opinion on the subject, more than 90 percent answered in terms of product quality or superiority. See Ex. 1 at 23 and T–8.

Abbott's third principal criticism of Dr. Ross's consumer survey is aimed at the questions about the proportion of doctors who would have to have preferred Similac to support the claim. Abbott argues the questions were "grossly unfair" because they ask lay people difficult problems about statistics and patterns of preferences. III Tr. 88 (McDonald). As Dr. McDonald observed, the consumers who were surveyed probably do not spend a lot of time thinking about "the base" and the difference between a majority and a plurality. *Id.*

The court would not hold Abbott to a standard of 90 percent preference simply because one-third or so of the respondents thought that is what "first choice" meant, at least initially, before they were asked

about the hypothetical survey of doctors. See Ex. 1 at F–13 (total of 32.8% answered 90% or more). The critical difference between a majority and a plurality, however, is well-recognized in the advertising business. See, *e.g.,* Ex. 25. When that difference was introduced expressly in the survey, an overwhelming proportion of respondents believed the "1st Choice of Doctors" claim would not be accurate if it were supported by only a plurality. Ex. 1 at F–15 (64.8 %—not accurate; 19.8 %—accurate; 15.4 %—no opinion). The court agrees with that overwhelming majority.

### (c) *Perception of Medical Superiority?*

The Ross survey of consumers shows persuasively that the actual takeaway, the actual message received by consumers, includes a perception that doctors prefer Abbott's products because doctors believe they are superior to Mead Johnson's products. That is a reasonable interpretation of the claim, and that is why the claim is so powerful. But Mead Johnson has tried to take the results of the Ross survey a step farther, beyond the consumer perception that doctors prefer Abbott products because they are superior or of higher quality. Mead Johnson argues that this perception by consumers means that "1st Choice of Doctors" amounts to a claim by Abbott that the Abbott products have been proven through scientific research to produce clinically better outcomes for the infants fed with those products. Mead Johnson has devoted a great deal of energy to proving that no such proof of clinical superiority exists.

The court is not persuaded by Mead Johnson's effort to transform the "1st Choice of Doctors" claim into an establishment claim for clinically proven superiority. First, Mead Johnson's argument on this point would effectively erase all distinctions between different kinds of advertising claims. Under Mead Johnson's approach, any advertising that effectively persuades consumers to buy a health care product (perhaps so long as it did not emphasize price) would be treated as im-

plicitly communicating a claim of scientific proof of superiority.

Second, and more important here, Mead Johnson has not supported this argument with the evidence of consumers' actual perceptions of the Abbott claim. The Ross survey shows that consumers "takeaway" *general* perceptions of product superiority from the "1st Choice of Doctors" claim. It did not go so far as to show that consumers perceived the "1st Choice of Doctors" claim in terms of superiority as specifically as Mead Johnson has argued—long-term clinically proven medical superiority. A doctor may have a significant professional preference between competing products based on perceptions of quality that are not supported by sophisticated clinical trials testing long-term results.

\* \* \*

Thus, the weight of the evidence presented thus far shows that the "1st Choice of Doctors" claim communicates two key messages to consumers: (1) a majority of doctors choose Similac or other Abbott brands over Enfamil and other competitors; and (2) the doctors' choices are the result of the exercise of the doctors' professional judgment about the quality of the products. The court next takes up the question whether Mead Johnson has shown that those messages are not fairly supported by the evidence about doctors' choices or preferences among the competing brands.

### 5. *The Evidence on the Market Research Among Doctors*

The central facts affecting all the market research and advertising in dispute in this case are these: surveys of doctors (especially pediatricians) show consistently (a) that a substantial proportion of doctors

do not have a professional preference between Mead Johnson's Enfamil brand and Abbott's Similac brand, but (b) that among doctors who do have a brand preference, more favor Abbott's Similac over Mead Johnson's Enfamil brand. The precise numbers vary from study to study. The different results arose from differences in survey questions and methodology, such as the strength of the "filter" question to screen out doctors who have no preference, how hard participants were pressed to express a preference for only one brand, and the extent to which the survey sought to evoke a thoughtful exercise of professional medical judgment as opposed to a doctor's quick, top-of-the-head recall of brands. Nevertheless, despite significant differences in the exact numbers from survey to survey, the overall pattern is consistent.

In challenging the validity of Abbott's claim to be "1st Choice of Doctors," Mead Johnson focuses on the lack of preference to argue that the claim is misleading. Abbott counters by focusing on the fact that, among doctors with a brand preference, Abbott products score higher than competing products.[5] Based on the evidence of consumers' perceptions of the claim, the court reasons that the "1st Choice of Doctors" claim could legitimately be supported only by evidence that a majority, not a plurality, of doctors express a professional "choice" or "preference" for Abbott's products over competitors' products. To be fair and not deceptive or misleading, the base against which the majority is measured must include doctors who do not have a choice or preference for a single brand. See *Gillette Co. v. Norelco Consumer Products Co.*, 946 F.Supp. 115, 124–125 & n. 7 (D.Mass.1996) (in evaluating claim of superiority based on consumer

5. In their internal strategy documents used to motivate sales personnel and to develop business plans, however, the parties' emphases are reversed. Abbott's documents focus on the high proportion of doctors who do not have significant brand preferences for Similac over Enfamil. See, *e.g.*, Ex. 17 at A047703

(sales training materials). Mead Johnson's documents focus on the plurality lead that Similac generally has over Enfamil among those doctors who express brand preferences. See, *e.g.*, Ex. 445; Ex. 451 at B1665; Ex. 453 at B1684.

test, responses favorable to competitor and "no preference" responses must be combined because all are responses contrary to claim of advertiser's superiority). The parties have presented evidence on numerous surveys of doctors, and the court must examine those surveys in detail.

### (a) *Dr. Ross Survey of Physicians*

After conducting his survey of consumer perceptions of the "1st Choice of Doctors" claim, Dr. Ivan Ross also conducted a telephone survey of physicians concerning their preferences for infant formula brands. The Ross survey used a "strong" filter question: "First thinking only about two brands of nonspecialized milk-base infant formula with iron, Similac With Iron and Enfamil With Iron, do you or don't you have a preference between them?" Ex. 2, Tab A at 1. In this survey, 64 percent of the physicians said they had no preference between the two brands. Ex. 2, Tab E at Table 1. Those who said they did have a preference were asked: "Which brand do you prefer?" If the answer was inconclusive ("it depends"), the interviewer asked: "If you usually have a preference, which brand do you usually prefer?" Using the total number of participants as the base, including the 64 percent with no brand preference, 25 percent preferred Similac, and 10 percent preferred Enfamil. Ex. 2 at 2; Ex. 2, Tab E at Tables 1 & 2.

The doctors were then asked: "Now, thinking only about two brands of soy-based infant formula, Isomil and ProSoBee—do you or don't you have a preference between them?" Ex. 2, Tab A at 3. In response to that question, 57 percent said they had no preference, 25 percent preferred Abbott's Isomil, and 15 percent preferred Mead Johnson's ProSoBee. Ex. 2, Tab E at Tables 11 & 12.

Dr. Ross concluded from his survey that Abbott's claim to be "1st Choice of Doctors," as it is understood by consumers, is not supported by the views of doctors. Abbott criticizes Dr. Ross's physician survey on several grounds.

First, Abbott argues that Dr. Ross used too strong a "filter" question by asking first whether the doctor had a preference between the two leading brands, and only then asking which brand the doctor preferred. Abbott contends that this strong filter was intended to increase the "no preference" category to support Mead Johnson's position. Abbott further contends that the strong filter has the undesirable effect, for market research purposes, of suppressing subtle or slight brand preferences that are nevertheless important.

The strong filter clearly had the effect of increasing the "no preference" category. In fact, the "no preference" group was larger in Dr. Ross's survey than in any of the other surveys introduced into evidence. Both sides agree that some filter must be used so that the respondent is told explicitly that a response of "no preference" or "no opinion" is perfectly acceptable.[6] If Dr. Ross's survey were the only evidence tending to show that Abbott can win only a plurality among doctors, and not a majority, Abbott's criticism on this point would be more powerful. The court does not base its decision today on the doubtful suggestion that *only* a "strong filter" question would be sufficient in a survey used to support the claim. As shown below, however, the great weight of doctor surveys that test doctors' professional views—not merely their casual brand familiarity—show that Abbott's Similac cannot win a majority among doctors. In light of all this evidence, the court finds that Dr.

---

**6.** See, *e.g., Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1549–50 (S.D.Tex.1996) (presence of a "don't know" option in consumer survey lent additional validity to results), *aff'd as modified on other grounds,* 155 F.3d 526 (5th Cir.1998); *L & F Products v. Procter & Gamble Co.,* 845 F.Supp. at 998 (court "greatly troubled" by survey's failure to provide "don't know" or "no opinion" option); *ConAgra, Inc. v. George A. Hormel & Co.,* 784 F.Supp. 700, 734 (D.Neb.1992) (citing testimony of Dr. Ivan Ross on importance of providing a "don't know" option for consumer studies done for legal purposes).

Ross's use of the strong filter did not undermine the validity of his survey here.

Abbott's point about the strong filter suppressing subtle but important brand preferences goes to the heart of a critical issue here. Dr. McDonald testified for Abbott that it is often important for market researchers to probe deeply, to tease out even slight and perhaps irrational and/or unconscious brand preferences. For many purposes, that view is no doubt correct.

The issue here is different. The issue here concerns the measurement of doctors' brand preferences for the purpose of persuading consumers to follow the views of the authoritative experts. Consumers value a doctor's recommendation so highly because they believe it reflects an expert's professional evaluation of the product's quality. Consumers do not value information about doctors' preferences based on the doctors' relationships with one brand's sales representative or based on other factors not related to product quality. The possibility that the strong filter in Dr. Ross's survey suppressed some slight preferences not related to perceptions of product quality also does not undermine the value of the survey for purposes of this case.

Abbott sharply criticizes Dr. Ross for using the word "preference" in his questions instead of the phrase "first choice." Abbott contends that any test of an advertising claim should use language as close as possible to the language in the claim itself. Dr. Ross explained that he used the word "preference" because of the possibility that, as a result of Abbott's extensive advertising with the phrase, the phrase "first choice" would trigger some responses that merely "played back" the advertising because of the association of the phrase with Abbott's product. II Tr. 135–37. Dr. McDonald disagreed, arguing that doctors are not so easily swayed by advertising slogans. III Tr. 68.

There is some validity to both Dr. Ross's and Dr. McDonald's views on this problem, and there is no perfect solution to it. Even if most doctors are not swayed by a mere advertising slogan, Abbott does use the "1st Choice of Doctors" slogan in advertising aimed at doctors, see Ex. 38, II Tr. 261, 269; I Tr. 52, presumably because it works. Also, in terms of consumer "takeaway," the differences between "first choice" and "preference" and "recommend" appear to be very slight. For example, in testing consumers' "takeaway" from a proposed advertisement emphasizing "1st Choice of Doctors," the results were reported to Abbott in terms that Similac is "the formula doctors *prefer*," Ex. 22 at A022990 (emphasis added), and that "Doctor recommendations" drove interest in the concept, *id.* at A022983. The court does not believe the use of the term "preference" in Dr. Ross's survey undermines its validity as *a test*, even if it is not *the one definitive test*, of Abbott's claim that Simila is "1st Choice of Doctors." Thus, the court is not persuaded by Abbott's criticisms of Dr. Ross's survey of doctors. The survey provides substantial support for Mead Johnson's contention that Abbott's ambiguous "1st Choice of Doctors" claim is misleading.

### (b) *The Glickman Surveys*

To support its claim to be "1st Choice of Doctors," Abbott relies primarily on surveys conducted by Glickman Research Associates and Burke Marketing Research. Those surveys require close scrutiny.

Glickman carried out so-called "check studies" in 1995 and 1996. Interestingly, for each of these studies, Glickman reported: "The objective of this study is to provide justification for [*i.e.*, not to "test"] the brand claim with regard to physician first choice recommendation of both Similac . . . and Isomil. . . ." Ex. 54 at A044972 (1995 study); Ex. 61 at A045016 (1996 study). In these studies, Glickman mailed checks in the amount of $1.00 to thousands of pediatricians. On the back of each check was printed a three-question questionnaire. The pediatricians were instructed

to complete the questionnaire when they endorsed the checks. By cashing the checks, the pediatricians returned the questionnaires to Glickman through banking channels.

With respect to milk-based formulas, the questionnaires on the back of the checks asked: "Which of the following routine infant formulas, if any, is your *first choice*' for a MILK-based feeding? (Please check only one.)" The available answers in order were:

Bonamil

Carnation Good Start

Enfamil

Gerber Baby Formula

Similac

SMA

Other (Please Specify)

None, do not have a "first choice"

See Ex. 54 at A044978; Ex. 61 at A045025.

Glickman reported the following results to Abbott for the milk-based products:

|  | 1995 | 1996 |
|---|---|---|
| Similac | 51% | 52% |
| Enfamil | 29% | 34% |
| SMA | 7% | 3% |
| Carnation Good Start | 1% | 1% |
| Bonamil | — | — |
| Gerber Baby Formula | — | — |
| Other | — | 1% |
| None, do not have a "1st Choice" | 20% | 17% |

See Ex. 54 at A044974; Ex. 433 at A045019.[7]

For soy-based formulas, the questionnaires asked: "Which of the following specialty infant formulas, if any, is your *first choice*' for a SOY-based feeding? (Please check only one)." In the 1995 survey, the available choices were Abbott's Isomil, Nursoy, Gerber Soy, Soyalac, I–Soyalac, Other, and "None, do not have a. '1st choice.'" The 1995 survey did not include Mead Johnson's ProSoBee brand, which is the principal competitor for Abbott's Isomil. See Ex. 54 at A044978. The 1996 survey of soy-based formulas included as

available choices: Abbott's Isomil, Mead Johnson's ProSobee, Nursoy, Carnation Alsoy, Gerber Soy, Other, and "None, do not have a '1st Choice.'" Ex. 61 at A045025. Glickman reported the following results to Abbott for the soy-based products:

|  | 1995 | 1996 |
|---|---|---|
| Isomil | 58% | 56% |
| ProSoBee | 13% | 29% |
|  | (write–in) |  |
| Nursoy | 8% | 3% |
| Soyalac | 1% | (N/A) |
| Soyalac | 2% | (N/A) |
| Carnation Alsoy | (N/A) | — |
| Gerber Soy | — | — |
| Other | — | 1% |
| None | 22% | 18% |

Ex. 54 at A044975; Ex. 61 at A045020. Because the 1995 questionnaire did not even include Mead Johnson's ProSoBee brand as a listed choice, those results have no probative value here.

The Glickman studies used exactly the same phrase—"first choice"—that Abbott uses in its advertising and that was being tested for purposes of claims substantiation. Each of the four Glickman surveys reflected responses of between 1734 and 1859 pediatricians.

There are several problems with Abbott's reliance on the Glickman studies to support the "1st Choice of Doctors" claim. First, when a pediatrician marked more than one brand as his or her "first choice," Glickman counted that response as a "first choice" for each brand marked. That approach is obviously inconsistent with an attempt to identify a single "first choice," whatever that claim might mean. A doctor who marked more than one brand as "first choice" is essentially saying she does not have a single first choice. The effect of Glickman's approach was to inflate brand preferences and to reduce the "none" or "no first choice" category. When the results of the Glickman surveys are adjusted to treat the multiple respons-

---

7. The responses in these columns add up to more than 100 percent because Glickman counted multiple responses as a "first choice" for each brand that was marked. See pages 894-96, below.

es as responses of "none," the results for milk-based feedings were as follows:

|  | 1995 | 1996 |
|---|---|---|
| Similac | 44% | 45% |
| Enfamil | 22% | 27% |
| None or multiple | 27% | 24% |

See Ex. 76 at 5; II Tr. 71 (Ross). That is, after a fair adjustment for multiple responses, the majority for Similac dropped down to a mere plurality. The results for the 1996 soy-based survey adjusted in the same appropriate way left Isomil with exactly 50 percent:

| Isomil | 50% |
|---|---|
| ProSoBee | 23% |
| None or multiple | 23% |

Ex. 76 at 5; II Tr. 71 (Ross). Even after these adjustments are made, the Glickman surveys pose problems. For example, Glickman undertook no effort to determine whether the questionnaires were actually filled out by the pediatricians instead of by other personnel in their offices. See II Tr. 65 (Ross).

More fundamental is the disconnect between on one hand the almost casual character of the question asked and the manner of its asking—on the back of a check of nominal value—suggesting the question should be answered off the top of the doctor's head, and on the other hand the weight that patients/consumers give to the physicians' expressions of preference. Dr. Ross described the answer to the $1.00 check survey as a "throw away exercise." II Tr. 239. The court agrees. To illustrate the importance, consider how seriously a doctor would consider a patient's question: "Doctor, which brand do you recommend I feed my baby?" and how seriously the doctor would treat a question on the back of a $1.00 check that is part of a mass mailing.[8]

The difference was underscored by Glickman's use of the phrase "first choice recommendation" to describe the claim in reporting the survey results, despite the fact that its studies did not attempt to ask about actual professional recommendations. See Ex. 54 at A044972; Ex. 61 at A045016. In contrast, many other surveys discussed below asked about recommendation practices and generated results showing much larger groups of doctors who did not have a preference between these competitors. Those surveys asked questions more closely in tune with consumers' actual perceptions of doctors' preferences and the value that consumers place upon those preferences.

There are still other problems with the Glickman surveys as support for the "1st Choice of Doctors" claim. The Glickman surveys use the phrase "first choice" that has been the subject of extensive advertising and promotion by Abbott. In a debate that echoes Dr. McDonald's criticism of Dr. Ross's survey for using the term "preference" instead of "first choice," Dr. Ross criticized the Glickman surveys because the use of the identical "first choice" phrase created a risk that the responses would reflect exposure to the phrase in the

---

**8.** Abbott cites *American Home Products Corp. v. Johnson & Johnson,* 654 F.Supp. 568, 586–88 (S.D.N.Y.1987), to argue that a claim of professional affinity or recommendation does not imply product superiority. In that case, the manufacturer of Tylenol advertised that hospitals "trusted" its product and supplied it ten times as often as competing pain-relief products. A competitor challenged that claim as deceptive on the theory that it implied product superiority, but the district court rejected the challenge. The court rejected it, however, on the basis that it reflected hospitals' actual practices in providing care to patients: "Hospitals surely wouldn't dispense an analgesic that is ineffective or unsafe, no matter how cheaply they can buy it. At worst, the statement is a half-truth, in that it omits to mention that hospitals choose Tylenol for the additional reason that it costs less than competitive analgesics. The Court finds that this omission does not make the 'hospitals trust' commercials unfair. There is nothing to prevent AHP from matching McNeil's prices to hospitals." 654 F.Supp. at 586. Where Abbott relies on surveys that probe doctors' actual professional practices, like some discussed below, the reasoning of *American Home Products* is applicable. It does not apply, however, to a $1.00 "check-rec" survey that made no effort to ask doctors about their actual practices as professionals.

previous advertising rather than an actual "choice" by the doctor. II Tr. 62–63. Dr. McDonald's rebuttal, that doctors are not so easily swayed by advertising, has some apparent validity, but it is not consistent with Abbott's actual commercial behavior in the marketplace. As discussed above, Abbott makes a point of using its "1st Choice of Doctors" slogan in advertising directed at doctors, II Tr. 269, presumably because it expects that phrase to encourage other doctors to go along with the professional crowd. Also, there is no perfect solution to the phrasing problem. Influence on even a small proportion of doctors, however, would have a significant effect on the validity of the Glickman surveys as support for Abbott's "1st Choice of Doctors" claim.

The parties focused much of their attention on whether the Glickman surveys should have used a stronger "filter" question to determine whether a responding physician actually had any preference between formula brands. Dr. Ross used the strong filter question: "First thinking only about two brands of non-specialized milk-based infant formula with iron—Similac With Iron and Enfamil With Iron—do you or don't you have a preference between them?" Ex. 2, Tab A at 1. That strong filter produced a response of "no preference" from 64 percent of the doctors responding. Ex. 2, Tab E at Table 1. The Glickman surveys used instead what Dr. McDonald called a "quasi-filter," III Tr. 57–58, by including the phrase "if any" in the question asking about "first choice," and by including a "none" line among the available choices. The result of this weaker filter was a much lower rate of "no preferences."

Abbott and Dr. McDonald point out that market researchers often try to tease out the slightest, most subtle preferences among competing brands. III Tr. 54. Even very slight, perhaps unconscious, preferences may affect buying behavior of consumers. III Tr. 54–55. As Abbott points out, the revenue from a sale is the

same whether the shopper's preference is slight or strong. Thus, it may be interesting, even vital, for Abbott and Mead Johnson to know about doctors' slight preferences for their brands, so that doctors responding to surveys should be pushed hard to express a single preference.

That valid point about market research, however, misses the point in question here, which depends on *consumer reaction* to advertising claims about doctors' choices, preferences, or recommendations. If consumers will reasonably interpret such an advertising claim as an expression of a doctor's expert professional judgment, the support for the claim should make at least some reasonable effort to determine how that doctor actually exercises his or her professional expertise. A question on the back of a $1.00 check simply does not do that, even if a fair calculation of the results had produced a majority of "first choices" for Abbott, and it did not.

### (c) *The Burke Surveys*

Abbott also relies on telephone surveys of pediatricians conducted by Burke Marketing Research in the summer of 1997. These studies were also designed "to support the claim" (*i.e.*, not to "test" the claim). See Ex. 66. In June 1997, Burke asked 300 pediatricians by telephone: "Which of the following infant formulas, if any, is your first choice for a milk-free feeding?" Ex. 432. The available choices were read in alphabetical order: Alimentum, Carnation Alsoy, Gerber Soy, Isomil, Nutramigen, Pregestimil, and ProSoBee. *Id.* The results were:

| | |
|---|---|
| Isomil | 48.7% |
| ProSoBee | 29.7% |
| Nutramigen | 4.3% |
| Alimentum | 3.3% |
| All others | 12.3% |
| None, do not have a "1st choice" | 1.7% |

*Id.*

In July 1997, Burke asked 301 pediatricians by telephone: "Which of the following infant formulas, if any, is your first choice for a milk-based feeding?" Ex. 431 at A022814. The choices, which were read in random order, were: Carnation Follow–

Up, Carnation Good Start, Enfamil, Gerber Baby Formula, Lacto–Free, and Similac. The results were:

| | |
|---|---|
| Similac | 55.5% |
| Enfamil | 37.2% |
| Carnation Good Start | 2.7% |
| Lacto–Free | 2.0% |
| Others | 0.7% |
| None, don't know | 2.0% |

*Id.* In the July 1997 survey, Burke also asked the pediatricians by telephone: "Which of the following specialty infant formulas, if any, is your first choice for a soy-based feeding?" *Id.* at A022815. The available choices were Isomil, ProSoBee, and Carnation Alsoy, read in random order, followed by Other, and "None, do not have a '1st Choice.' " The results as reported to Abbott were:

| | |
|---|---|
| Isomil | 58.8% |
| ProSoBee | 37.5% |
| Carnation Alsoy | 1.3% |
| All others | 0.7% |
| None | 1.6% |

*Id.*[9]

There is a serious flaw in the Burke survey as fair support for the Abbott claim. The interviewers were instructed to press a doctor for a single "first choice" even if the doctor initially expressed reluctance to do so. The instructions told interviewers that they should not accept multiple responses, that they could accept only one response. To make matters even worse, if the doctor gave multiple responses and persisted in doing so on being asked a second time to identify a "first choice," the interviewers were instructed to treat that response as a "null," or "no answer," meaning that the doctor's response would not even be counted as "None, do not have a '1st choice.' " See Ex. 65 ("none" to be treated as "no answer").

It is not possible to tell from Burke's records how many doctors attempted to respond that they had no single "first choice" formula but provided such a response to the interviewer's second attempt, nor how many doctors insisted on giving multiple responses and thus had their responses not counted at all, not even toward "none." The Burke surveys thus produced "no preference" results that are at the extreme low end of the spectrum of the many market surveys in this record—less than two percent. By excluding from the base an unknown number of doctors who refused to express a single "first choice" even after being pressed to do so, the Burke survey is entitled to little or no weight as support for Abbott's claim.

Thus, among the parties' surveys of doctors designed specifically to test Abbott's "1st Choice of Doctors" claim, the Ross survey provides substantial evidence for finding that the claim is misleading. The Glickman and Burke surveys, on the other hand, were infected by flaws that undermine the support they might have provided for the claim. The parties have also submitted a host of other surveys of doctors concerning infant formulas, and the court turns next to those surveys.

#### (d) *Cooper Research "Physician Tracking Studies"*

Abbott has commissioned Cooper Research to conduct surveys of 200 pediatricians twice a year for at least several years. The key questions ask: "Do you have a single preferred brand of infant formula that you usually recommend to your patients?" and then, if the answer is yes, "Which one brand of infant formula is your preferred brand?" Ex. 74 at A050742. The results have been:

---

**9.** A dispute arose in the hearing concerning whether interviewers for the Burke surveys actually included as options "none," "other," and "do not have a first choice" as they read the list to the participants. The dispute is based on a discrepancy between written questionnaires and a computer diskette about which relatively little is known. See Exs. 64 & 133. On this limited record, the more reliable evidence tends to show that the interviewers did include "other" and "none, do not have a first choice" in the list they read to the participants. See Exs. 431 & 432.

| | 1Q96 | 3Q96 | 1Q97 | 3Q97 | 1Q98 | 3Q98 |
|---|---|---|---|---|---|---|
| Has no preferred brand | 53% | 51% | 54% | 43% | 46% | 48% |
| Has a preferred brand | 47% | 49% | 46% | 58% | 54% | 52% |
| Abbott (all products) | 26% | 30% | 26% | 32% | 33% | 36% |
| Mead Johnson (all products) | 19% | 17% | 19% | 23% | 20% | 16% |

Ex. 74 at A050742. These questions—asking what the pediatrician "usually recommends to your patient"—are aimed at determining how a pediatrician actually exercises his or her professional judgment. These results show consistently that for no more than one-third of pediatricians is Abbott's Similac a single preferred brand that they usually recommend over Mead Johnson's Enfamil.

Abbott contends the Cooper Research surveys are not inconsistent with its "1st Choice of Doctors" claim because the claim is not limited to doctors who recommend only one brand of formula. The questions in the Cooper Research surveys left room for a doctor to recommend multiple brands to patients but still to have a "first choice" for a particular brand. Abbott's point is correct as a matter of abstract logic, but its argument illustrates the ambiguity of the "1st Choice of Doctors" claim. Most important, the questions in the Cooper Research tracking studies asked for responses that coincide fairly closely with the *consumer* response to the meaning of the "1st Choice of Doctors" claim—that the claim means that doctors exercising their *professional judgments* prefer Abbott's formulas over Mead Johnson's.[10]

The most detailed report from these tracking surveys is from the "Wave 3" survey conducted in January and February 1996. See Ex. 72. That survey reported that 53 percent of pediatricians had "no single preferred brand" of infant formula. Ex. 72 at A017108. (That answer was elicited in response to a "strong filter" question: "Do you have a single preferred brand of infant formula that you usually recommend to your patients?" Ex. 72 at A017261.) The survey also reported that 70 percent of pediatricians viewed "all brands as similar." *Id.* at A017131. Those included 52 percent who did make brand recommendations, consisting of 29 percent who recommended one or two brands based on the service provided by the sales representatives and another 23 percent who recommend one or two brands based on a product preference. *Id.* Among another 29 percent of pediatricians who viewed brands as different, only a meager three percent viewed one brand as better than the others and recommended only that product. *Id.*

By 1997, the percentage of pediatricians who had one preferred brand of formula had declined to 46 percent. Ex. 73 at A016286. The percentage who said an Abbott product was their "one preferred brand" had declined to 26 percent. *Id.*

The most recent Abbott survey, from the third quarter of 1998, is reported in Exhibit 74. The survey in that quarter used some different questions, so the results of prior surveys cannot be compared directly. Nevertheless, Abbott learned that 62 percent of pediatricians viewed all infant formula brands as similar. Ex. 74 at A050733. Only 22 percent of pediatricians recommended one brand primarily. *Id.* Only 9 percent believed one brand was better than all the others. *Id.* In response to the questions about a single preferred brand, the 1998 survey reported that 52 percent of pediatricians had a single preferred brand, with Abbott products pre-

10. The questions in the Cooper Research study also track closely with Dr. Ross's questions to physicians.

ferred by 36 percent and Mead Johnson preferred by 16 percent. *Id.* at A050742.

Other Abbott documents reflect similar overall numbers. Information prepared for a brand review meeting looking to 1998 marketing efforts reported that 71 percent of pediatricians saw all brands as similar. Ex. 14. Materials that Abbott used to train sales representatives in June 1997 reported that 53 percent of pediatricians did not have a single preferred brand, while 24 percent preferred Similac and 18 percent preferred Enfamil. Ex. 17 at A047703.

In sum, the Cooper Research tracking studies do not support Abbott's claim to be "1st Choice of Doctors" as consumers reasonably understand the claim. The Cooper Research surveys instead tend to support Dr. Ross's conclusion that the claim is misleading.

(e) *Contemporary Pediatrics Studies*

The magazine Contemporary Pediatrics conducted surveys of pediatricians concerning their recommendations with respect to a wide variety of products. In 1997, the relevant questions read as follows:

> "For each product category you recommend OTC [over-the-counter] products, which BRAND NAME PRODUCTS do you recommend most often? *(Please specify ONLY your 1st and 2nd BRAND NAME choices.)* "

> "If you *DO NOT* recommend OTC products by SPECIFIC BRAND NAME, please check the box to the right."

Ex. 443 at 49102 (emphases in original). In response to these questions, 363 pediatricians gave some answer with respect to non-soy formulas. Ex. 444 at A049277, A049280. Among those, 170 identified Similac or other Abbott products as their first choice, 127 identified Enfamil or other Mead Johnson products as their first choice, 61 said they did not recommend specific brands, and there were 5 other responses. The magazine and Abbott cal-

culated percentages based on the 302 pediatricians who said they did recommend specific brands. Using as a base only those participants who said they did recommend specific brands, 56.3 percent listed an Abbott product as their first choice, while 42.1 percent listed a Mead Johnson product as their first choice. But using the more appropriate base of 363, which includes those pediatricians who did and those who did not recommend specific brands, the numbers drop to 46.8 percent for Abbott products and 35.0 percent for Enfamil products. See Ex. 444 at A049277, A049280.

Abbott contends the Contemporary Pediatrics survey results show its "1st Choice of Doctors" claim is "absolutely true." They do not show any such thing. They show only that when the "base" is sufficiently restricted to the sub-group of pediatricians who have meaningful brand preferences, a majority of those doctors recommend Abbott products as their "first choices." That fact may be interesting and useful to marketers competing for market share. But the manipulation of the base needed to produce a "majority" simply is not consistent with a fair reading of Abbott's "1st Choice of Doctors" claim or with consumers' reasonable understandings of the claim. Abbott's interpretation of this study is an example of falsely implying a "majority win" when it had won only a plurality. See Ex. 25 at A050677 (ARF seminar); see also *Gillette Co. v. Norelco Consumer Products Co.,* 946 F.Supp. 115, 124–25 & n. 7 (D.Mass.1996) (in testing electric shaver's claim of superiority over "wet-shaving" in consumer tests, responses in favor of "wet-shaving" and "no preference" should be combined as responses against superiority of electric shaver).

For soy-based formulas, 397 pediatricians gave some answer. Ex. 444 at A049279. Among those, 217 identified Isomil as their first choice, 110 identified ProSoBee, 60 said they did not recommend specific brands, and 10 gave other respons-

es. The magazine and Abbott calculate that 64.4 percent identify Isomil as their first choice and 32.6 percent identify ProSoBee as their first choice, *id.*, but those figures excluded from the base the 60 pediatricians who said they did not recommend specific brands. Using the more appropriate base, which includes the pediatricians who do not recommend specific brands, however, the percentages of "first choice" are 54.7 percent for Isomil and 27.7 percent for ProSoBee. That result is still a majority for Isomil and cannot be explained away by criticizing the survey methodology. This unimpeached majority result, which is also tied directly to pediatricians' actual recommendations to their patients, leads the court to conclude that Mead Johnson has not shown a likelihood of prevailing on its claim that "1st Claim of

Doctors" is misleading as applied to Abbott's Isomil formula.

### (f) *Mead Johnson's Physician Tracking Studies*

Abbott contends that its "1st Choice of Doctors" claim is also supported by Mead Johnson tracking studies among pediatricians. These studies used samples of 200 pediatricians interviewed by telephone. In five studies conducted between March 1995 and July 1996, pediatricians were asked first: "Overall, what percent of the time would you say you recommend the one specific brand of infant formula to be used versus recommending several brands and/or allowing the mother to make the brand choice?" Respondents were then asked, "What ONE brand of infant formula do you recommend most often?" Ex. 447 at B3643. The results were as follows:

| | 3/95 | 7/95 | 11/95 | 3/96 | 7/96 |
|---|---|---|---|---|---|
| Recommend several brands and/or allows mother to make the brand choice | 49% | 49% | 47% | 53% | 49% |
| Physician recommends one brand | 51% | 51% | 53% | 47% | 51% |

See Ex. 456 at PAR00218. For the question asking what one brand of formula the pediatrician recommended most often, the results were:

| | | | | | |
|---|---|---|---|---|---|
| Similac or (w/Iron) | 45% | 48% | 45% | 47% | 44% |
| Enfamil or (w/Iron) | 25% | 25% | 30% | 37% | 40% |
| None | 1% | 1% | 2% | 0% | 2% |
| "No one brand" | 24% | 20% | 18% | 12% | 12% |

Ex. 456 at PAR00215. These surveys used weaker filters and recognized that a doctor's recommendation practices could vary from patient to patient. As a result the "no one brand" group was smaller, but Similac's numbers remained less than a majority.

In December 1997, a similar survey was conducted for Mead Johnson with slightly different questions. A sample of 200 pediatricians was interviewed by telephone. After answering an unusual filter question—"What percentage of the time do you make no recommendation?"—The pediatricians were asked: "What one brand of

infant formula do you recommend most often?" The results among pediatricians who recommended formulas were reported as follows:

| | |
|---|---|
| Similac | 63% |
| Enfamil | 32% |
| None | 2% |

Ex. 446 at B3578. This survey appears to provide the strongest support yet for Abbott's claim for Similac. The detailed data from the survey show, however, that the 63 percent result was calculated on a base that included all pediatricians who said they ever made brand recommendations, no matter how frequently or infrequently, and did not include the five percent of the total sample who said they never made any brand recommendations. Compare Ex. 447 at B3633–34, Column A (10 pediatricians, or 5 percent of base of 200, said they made no brand recommendation 100 percent of the time, while oth-

ers made no recommendation with varying frequency), with *id.* at 3643, Column A (63 percent calculated on base of all 190 pediatricians who ever made brand recommendations). Because of the complications resulting from the questions about the frequency with which the pediatrician made any brand recommendations, the survey does not provide reliable support for Abbott's "1st Choice of Doctors" claim. For example, a later report supplying additional information on this survey appears to indicate that 56 percent of brand recommendations were for more than one brand, while only 34 percent were for one specific brand. See Ex. 445 at PAR00097 (reporting results of national sample).

In January 1998, Mead Johnson repeated the survey among only 55 pediatricians in three cities where Abbott had first introduced its reformulated Similac. When asked what one brand of formula they recommended most often, in that survey 64 percent named Similac, 31 percent named Enfamil, and 2 percent said none. Ex. 445 at PAR 00098. This survey suffers the same limitations as the national survey, see Ex. 445 at PAR00097 (58 percent of recommendations for more than one brand and only 33 percent for one specific brand), plus it involved a very small sample. This survey also does not provide reliable support for Abbott's claim as it is understood by consumers.

Mead Johnson hired MedProbe to conduct a similar study in January 1997 using a sample of 101 pedatricians. These pediatricians were asked: "Of the following choices, which is the most accurate for you personally? YOU PRIMARILY recommend:"

| | |
|---|---|
| A single brand of routine formula | 61% |
| Similac | 44% |
| Enfamil | 17% |
| Do not primarily recommend a single brand of routine formula | 39% |

See Ex. 450 at MP 0082; Ex. 451 at B1664–65. Abbott portrays these results as 71 percent recommending Similac and 27 percent recommending Enfamil. That conclusion uses as the base only those pediatricians who "primarily recommend a single brand." See II Tr. 193–96. Mead Johnson itself used the smaller base in an internal report warning about the results. See Ex. 451 at 1665; cf. Ex. 504 at C–108 (breaking down data as set forth above). As support for the "1st Choice" claim, however, the larger base is relevant, and the result is short of a majority.

In April 1997, Mead Johnson hired Market Measures, Inc. to survey a sample of 100 pediatricians. In a written questionnaire, they were asked: "When you do make a specific recommendation of a single non-specialized (routine) milk-based formula, which brand do you recommend as your Infant Formula of Choice?" The results were:

| | |
|---|---|
| Abbott (all products) | 34% |
| Mead Johnson (all products) | 25% |
| "Never Recommend One Specific Brand" | 38% |
| "Do not Recommend by and Brand Name" | 1% |
| Other | 2% |

Ex. 452 at D29. Using the base of only those doctors who make specific recommendations, Abbott interprets these results as 54 percent for Similac and 33 percent for Enfamil. In fact, Mead Johnson itself used the 54 percent and 33 percent figures in internal reports on these results. See Ex. 453 at 1684; Ex. 506 at 4662. The appropriate calculation for present purposes, however, must include in the base those doctors who do not make specific brand recommendations, leaving Abbott well short of a majority.

Mead Johnson hired Wirthlin Worldwide to conduct one-hour interviews with 103 health care professionals in June 1997. Among the respondents, 52 were pediatricians, 26 were hospital nurses, and 25 were pediatric nurses. They were asked:

I am going to read you some statements which represent different ways health professionals choose to talk to mothers about formula. For each one I read, please tell me approximately the percentage of times you use this approach when interacting with mothers on the decision to use a specific non-specialized

milk-based formula brand. These should add up to 100% (SHOW CHART):

"I recommend (Brand X)."

"All brands are the same. It does not matter what you use."

"All brands are similar. I like (Brand X); it is fine."

"I recommend either (Brand X) or (Brand Y)."

Ex. 454 at G583. Respondents were then asked: "If you had to choose, which brand of infant formula do you personally prefer?" Ex. 454 at G571. The 52 pediatricians' responses were as follows:

| | |
|---|---|
| Similac | 52% |
| Enfamil | 23% |
| Other | 4% |
| No Preference | 12% |
| Question not asked | 10% |

Ex. 454 at G571. This survey produced a result over 50 percent for Similac with an appropriate base, but it did so only with the artificially "forced" choice question, which is not a legitimate test (nor was it designed to be, of course) for testing Abbott's "1st Choice of Doctors" claim. The question beginning "if you had to choose" can be described as the polar opposite of the "strong filter" used by Dr. Ross. Also, the sample size in the Wirthlin Worldwide study was very small.

In 1997 Mead Johnson hired Market Measures Inc. to conduct a survey among 675 pediatricians. The respondents were asked: "Do you ever make non-specialized (routine) milk-based formula BRAND recommendations to parents of NON–WIC babies, or not?" Those who said yes were then asked: "When you do make brand recommendations of non-specialized (routine) milk-based formulas, do you usually:

Recommend a single brand

Recommend multiple brands"

Respondents were then asked: "When you do make a *specific* recommendation of a *single non-specialized (routine) milk-based formula*, which *brand* do you recommend as your Infant Formula of Choice?" Ex. 455 at D 06367–68. The results as

tabulated by Mead Johnson were as follows:

| | |
|---|---|
| Abbott (all products) | 27.7% |
| Mead Johnson (all products) | 12.4% |
| Never Recommend One Specific Brand | 27.0% |
| Do Not Make Any Brand Recommendation | 28.5% |
| Other Brands | 2.2% |
| No Answer | 2.2% |

See Ex. 76 at 18; see also Ex. 455 at C2411–12. Abbott focuses on the 165 respondents in Column E who said they recommend a single brand. Among that sub-group, 60.6 percent said they recommended Abbott products (Similac or Isomil), while 24.8 percent said they recommended Mead Johnson products (Enfamil, ProSoBee, or unspecified). Ex. 455 at C2411 (reverse side). Again, for testing the Abbott claim, however, the base must include the physicians who do not make specific brand recommendations. As a result, the relevant number from this survey is 27.7 percent, well short of a majority.

\*        \*        \*

Thus, in light of all the evidence presented thus far, the court finds that Mead Johnson has shown a substantial likelihood of prevailing on its claim that Abbott's use of the "1st Choice of Doctors" claim in its advertising is misleading consumers in two independent respects in violation of the Lanham Act. The claim is misleading first in that consumers reasonably understand it to express the choices of a majority of doctors rather than a mere plurality, and second in that consumers reasonably understand it to express doctors' preferences based on the exercise of their professional judgments rather than superficial or "top of the head" brand familiarity. The Glickman and Burke surveys cited by Abbott do not fairly support the "1st Choice of Doctors" claim as it is reasonably understood by consumers in either respect. Dr. Ross's survey tends to show the claim is not supported in either respect. The numerous other studies of doctor choices/preferences/recommendations which tended to explore professional judgments and practices rather than product

familiarity show that Similac has a consistent plurality, but not a majority needed to keep the claim from misleading customers. The "1st Choice of Doctors" claim can be supported, however, as applied to Abbott's Isomil soy-based formula. The court turns next to the additional factors governing the grant or denial of preliminary injunctive relief.

### III. *Harm to Mead Johnson*

■ The Seventh Circuit's decision in *Abbott Laboratories* emphatically followed the "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." 971 F.2d at 16 (collecting cases). In that case the Seventh Circuit vacated the district court's denial of a preliminary injunction despite the district court's detailed explanation of why it found that the unusual structure of the particular product market rebutted the presumption of irreparable harm. The Seventh Circuit said that the district court had overlooked the "lingering, incalculable" effects of a competitor's misleading advertising campaign. *Id.* at 16–17.

The evidence here is consistent with the presumption of irreparable harm. Abbott has been using the superlative claim—"1st Choice of Doctors"—heavily in its advertising directed at consumers and doctors. Mead Johnson's McCabe pointed out that his sales force must contend every day with that misleading claim as they try to sell Mead Johnson's products. All marketing and market research witnesses agree that the claim is a powerful one, one that has a significant effect on consumer behavior. This is precisely the kind of situation in which the presumption of irreparable harm has a solid foundation. The presumption has not been rebutted here.

Abbott argues, however, that the presumption of irreparable harm should not apply to this case because Mead Johnson waited so long to file suit and seek injunctive relief. Abbott has used other versions of a "1st Choice" claim since 1989 and began using the "1st Choice of Doctors" claim in 1995. Mead Johnson first took legal action against the "1st Choice of Doctors" claim in a proceeding before the Federal Trade Commission in March 1997. Mead Johnson filed this suit in July 1998. Abbott contends the delay alone warrants denial of injunctive relief. See, *e.g.*, *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir.1995) (inexcusable delay in seeking preliminary injunctive relief "may" undermine presumption of irreparable harm in Lanham Act case); *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 887 (N.D.Ill.1992) (same).

■ Mead Johnson's delay in filing suit here does not warrant denial of injunctive relief. First, even inexcusable delay is only one factor the court must consider, not necessarily a controlling reason to deny relief. *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir.1979); accord, *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed.Cir.1988). *Tough Traveler* and *Ohio Art Co.* do not suggest otherwise. The other factors relevant here, including the public interest in stopping misleading advertising and the policy foundations for the general presumption of irreparable harm, weigh in favor of granting relief. In this market there is an almost entirely new set of consumers every few months. Consumers who are misled by deceptive advertising are harmed, and slower relief is better than no relief.

■ Second, the court does not view Mead Johnson's delay as inexcusable in any event. Although Abbott has used the "1st Choice of Doctors" flag on its product label since sometime in 1995, Mead Johnson's McCabe testified without contradiction that Abbott has been increasing the amount of money spent to push this particular claim. I Tr. 55–56. That is the kind of change in circumstances that could reasonably allow a company in Mead Johnson's position to say that a tolerable situation has become intolerable and is worth the expense and trouble of litigation.

Also, McCabe pointed out that Mead Johnson understandably began to take new interest in the issue when Abbott used the "1st Choice of Doctors" claim to promote its newly reformulated Similac in 1997. I Tr. 56. Abbott reformulated its Similac product in 1997 with the addition of free nucleotides. Abbott launched the reformulated product with considerable fanfare, and the advertising for the reformulated product featured the "1st Choice of Doctors" claim. Mead Johnson has asked, quite reasonably, how Abbott could claim that a newly reformulated product was the "1st Choice of Doctors" when it had not even been on the market, and how such advertising claims for such a new and improved product could be supported based on surveys of doctors asking about their views on the older, "unimproved" product. See I Tr. 56.

Abbott also argues that the presumption of irreparable harm applies only when the advertising contains direct comparative claims. Both the legal and factual premises of Abbott's argument are wrong. As legal support, Abbott cites *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th Cir.1997), and *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992), but neither opinion suggests the presumption of irreparable harm is *limited* to comparative advertising. *Abbott* also cites *J & M Turner, Inc. v. Applied Bolting Technology Products*, No. CIV. A. 95–2179, 1996 WL 32114, at *12 (E.D.Pa. Jan. 26, 1996), which endorsed such a limitation as one of several grounds for denying injunctive relief. The *J & M Turner* court cited the Seventh Circuit's decision in *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d at 16, but the Seventh Circuit opinion indicates no such limit on the presumption of irreparable harm in Lanham Act cases. *J & M Turner* is not persuasive as establishing such a limit on the presumption.

The factual premise of Abbott's argument is also wrong. The "1st Choice of Doctors" claim is inherently a comparative claim—in fact, it is not merely a compara-

tive claim, but a superlative claim, claiming to be preferred over all other competitors, and especially of course over its chief competitor, Mead Johnson's family of products. See *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir.1993) (advertising claim that motor oil provides "longer engine life and better engine protection" implicitly compared performance to other leading brands). The presumption of irreparable harm applies in this case. These are the sorts of business experiences that provide the foundation for the presumption of irreparable harm.

Abbott also argues that Mead Johnson acted inexcusably by pursuing before the NAD a challenge to Abbott's advertising for the newly reformulated Similac without raising any challenge to the "1st Choice of Doctors" claim in that forum. Mead Johnson obtained some relief through the NAD in which Abbott agreed (the NAD does not have coercive power) to modify its advertising. Abbott argues that the delay caused it to incur costs by changing its advertising in response to the NAD challenge, and that those costs will be for naught if this court orders it to modify its advertising.

The court is not persuaded. First, the changes Abbott made in response to the NAD decision were, from a legal point of view, voluntary changes. The NAD had no authority to order Abbott to make those changes. Second, the federal courts remain the legal forum for adjudicating Lanham Act claims. This court's responsibility is to enforce the Lanham Act and to protect not only competitors but also the public from deceptive advertising. Third, Abbott has not been at all specific about the costs it incurred in responding to the NAD decision, and the "tens of thousands of dollars" mentioned in Abbott's brief (at page 49) would amount to a minimal expense in the context of this case.

IV. *Harm to Abbott from Injunction*

█ Mary Gottenborg testified about the harm Abbott would suffer from an

injunction. Because the "1st Choice of Doctors" claim is central to Abbott's brand positioning statement and advertising programs for Similac and related products, Gottenborg testified, Abbott will lose market share, goodwill, and brand equity if it is not able to use the claim. II Tr. 276. The logistics of a change would also pose a significant challenge because of labels, packaging, and advertising that would need to be changed. Gottenborg did not try to put any specific dollar figures on potential consequences, other than to say that every point of market share is worth "millions of dollars" to Abbott. II Tr. 279.

Abbott argues that "courts routinely refuse to preliminarily enjoin brand positioning statements." Abbott Br. at 48, citing *Abbott Laboratories*, 971 F.2d at 17, and *Golden Bear Int'l, Inc. v. Bear U.S.A., Inc.*, 969 F.Supp. 742, 747 (N.D.Ga.1996). The citation to *Abbott Laboratories* does not support the contention. In the cited passage, the Seventh Circuit recognized that an injunction ordering the defendant to recall its product, to stop using the product name, and to change its label would cause serious harm to the defendant. But the Seventh Circuit also pointed out that less drastic relief—prohibiting the defendant from continuing the false claims and ordering it to issue corrective advertisements and brochures—would not have such drastic consequences, and held that the district court had. erred by failing to consider these less drastic alternatives. 971 F.2d at 17.

In this case, Mead Johnson is seeking some of the less drastic forms of relief that the Seventh Circuit discussed in *Abbott Laboratories*. There is no doubt that Abbott will suffer harm if it is ordered to stop using the misleading "1st Choice of Doctors" claim. That harm is not comparable, however, to the harm it would suffer from an order imposing the more drastic forms of relief discussed in *Abbott Laboratories*, such as an order requiring it to change the name of Similac or its other brand names. As set forth below, this court is ordering

the less drastic forms of relief which, under the Seventh Circuit's opinion in *Abbott Laboratories*, plainly would have been warranted.

Abbott's citation to *Golden Bear* also provides no meaningful support on this point. In that trademark case, the district court denied preliminary injunctive relief after finding that the "Golden Bear" trademark associated with golfer Jack Nicklaus was not confusingly similar to the defendant's bear trademark and that the parties marketed their products to different markets and through different distribution channels. See 969 F.Supp. at 744–46. In the cited passage, the district court also noted that the defendant had recently changed its logo to avoid counterfeiting, and that another change of its logo would cause ruinous losses for the small, start-up company. *Id.* at 747. As a factual matter, that situation is simply not comparable to the effects of an order requiring Abbott to stop using the misleading "1st Choice of Doctors" claim in its advertising and labels for Similac. The district court's opinion certainly does not support Abbott's assertion that "courts routinely refuse to preliminarily enjoin brand positioning statements."

Abbott chose to build its brand positioning statement around the ambiguous and ephemeral "1st Choice of Doctors" claim. The claim is, by definition, vulnerable to disproof by the ebbs and flows of professional opinions. Having chosen such a vulnerable foundation, Abbott's argument that correction of the misleading claim would cause it such overwhelming injury that the court should deny relief is not persuasive.

V. *The Public Interest*

■ Again, the Seventh Circuit's decision in *Abbott Laboratories* provides guidance on this final element of the preliminary injunction standard. The court explained that preliminary injunctive relief ordering the defendant to "purge the false aspects of its promotional campaign

and issue corrective advertising" would "serve, rather than disserve, the public interest in truthful advertising, an interest that lies at the heart of the Lanham Act." 971 F.2d at 19 (holding that district court erred by failing to consider whether such limited relief aimed at advertising, rather than forcing removal of product from market, would serve public interest in truthful advertising).

Abbott's "1st Choice of Doctors" claim is also the subject of an investigation by the Federal Trade Commission. Abbott argues that this court should defer to the FTC, leaving the protection of the public interest to that agency's expertise. Abbott has cited cases in which courts have recognized the FTC's expertise in this area. See *Kraft v. FTC*, 970 F.2d 311, 317, 319 (7th Cir.1992); *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 229 (3d Cir.1990); *Thompson Medical Co. v. FTC*, 791 F.2d 189, 193 (D.C.Cir.1986). Abbott also invokes the doctrine of primary jurisdiction, suggesting that this court should take no action pending the outcome of the FTC investigation. See generally *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 654, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Because the "1st Choice of Doctors" issue is also before the FTC, Abbott argues, it would be appropriate for this court to take no action on the motion for preliminary injunction. See *American Trucking Ass'ns, Inc. v. ICC*, 682 F.2d 487, 492 (5th Cir.1982); *Tutoki v. Celebrezze*, 375 F.2d 105, 107 (7th Cir.1967); *Frontier Communications of Mt. Pulaski, Inc. v. AT & T Corp.*, 957 F.Supp. 170, 176 (C.D.Ill.1997) (declining to apply doctrine of primary jurisdiction or to defer to FCC).

Abbott has (understandably) stopped short of arguing that primary jurisdiction formally applies to this case. See Abbott Br. at 51. Where Congress has provided for private enforcement of federal law, it has done so for a reason. Public law enforcement agencies have limited resources, staffs, and dockets. By allowing for private enforcement of federal laws, as it has in the Lanham Act, Congress has made it clear that courts, and parties seeking courts' help in enforcing the law, need not wait for other agencies to get around to making a decision in a closely related matter. See *Porous Media Corp. v. Pall Corp.*, 110 F.3d at 1335–36 n. 8 ("Congressional policy appears to encourage commercial firms to act as the fabled 'vicarious avenger' of consumer rights."), quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.04(3)(d), at 27–48 (3rd ed.1996). In fact, in cases like this one, where a well-financed competitor brings a private claim under the Lanham Act, the FTC might reasonably decide to focus its limited resources in other directions, where private parties are not trying to take on the role of "private attorneys general."

## VI. *The Scope of Injunctive Relief*

Mead Johnson has met its burden on all four elements necessary for preliminary injunctive relief. It has shown a substantial likelihood of prevailing on the merits of its claim that "1st Choice of Doctors" violates § 43(a)(1)(B) of the Lanham Act as applied to Abbott's Similac brand. Mead Johnson has also shown that it is suffering irreparable harm from the misleading advertising. Although a preliminary injunction will cause harm to Abbott, that harm and the risk that it will be inflicted erroneously do not outweigh the need for injunctive relief to protect the public and Mead Johnson from continuing harm. The public has a substantial interest in injunctive relief here.

Neither side has addressed in detail the appropriate scope of relief. The Seventh Circuit decision in *Abbott Laboratories* shows the need to confine the scope of injunctive relief to that which is needed to prevent the harm. See 971 F.2d at 17–18 (district court erred by failing to consider

relief less draconian than blocking sales of defendant's products). The actionable, irreparable harm here stems from Abbott's use of the claim "1st Choice of Doctors" and from nothing else.

Accordingly, the court is issuing a preliminary injunction today with the following provisions:

(1) Beginning April 5, 1999, Abbott Laboratories shall not distribute, mail, broadcast, or otherwise advertise in any medium in the United States its Similac infant formula or any other infant formula (with the exception of the Isomil brand) using the claim "1st Choice of Doctors."

(2) Beginning April 12, 1999, Abbott Laboratories shall not include the claim "1st Choice of Doctors" on the labels and packaging for its Similac infant formula or any other infant formula (with the exception of the Isomil brand) in the United States. This provision shall not prevent Abbott Laboratories from selling or distributing labelled inventory of Similac or other brands that Abbott Laboratories has on-hand as of April 12, 1999.

(3) The injunction shall apply to defendant Abbott Laboratories, its officers, directors, employees, attorneys, and agents, and to other persons in active concert with Abbott Laboratories who have actual notice of the preliminary inunction.

(4) The injunction shall remain in effect pending further order of the court.

Neither side has offered specific arguments on an appropriate value of security for the injunction under Rule 65(c). In view of the stakes involved, and in the absence of further guidance from the parties, the preliminary injunction shall take effect only if Mead Johnson posts no later than March 28, 1999, a bond or other security in the sum of One Million Dollars ($1,000,000).

### Conclusion

For the foregoing reasons, Mead Johnson's motion for preliminary injunction is granted to the extent set forth above.

### MODIFIED PRELIMINARY INJUNCTION OF APRIL 13, 1999

On March 18, 1999, this court issued a preliminary injunction under the Lanham Act against defendant Abbott Laboratories relating to use of its advertising claim "1st Choice of Doctors." On March 25, 1999, Abbott filed an emergency motion seeking modification of deadlines in the original injunction. Abbott has argued primarily: (a) that it could not physically comply with the original timetable for modifying its packaging and labeling; (b) that certain promotional materials had substantial educational content and value, and made only minimal use of the deceptive claim; (c) that other promotional materials made only incidental use of the deceptive claim (most often in photographs of Similac packages showing the "1st Choice of Doctors" claim in small, barely legible print).

The court made certain interim modifications after a hearing on March 26, 1999, and set the matter for a further hearing that was held on April 13, 1999. The court's findings of fact and conclusions of law supporting the injunction are set forth in the court's entry of March 18, 1999, and remain in effect. With respect to the modifications requested by Abbott and Mead Johnson's objections, the court has set forth its reasons for the modifications in open court.

Resolving these matters has required the court to examine numerous promotional pieces distributed by Abbott and to use the court's equitable judgment to balance the need for effective preliminary injunctive relief against practical limitations on modifying packaging and advertising on short notice, as well as to recognize specific situations in which insistence on very short deadlines for compliance would add little or nothing to serve the purpose of the Lanham Act and the central provisions of the injunction. As the court stated at the hearing on March 26, 1999, the court also

recognizes the plaintiff's delays in seeking preliminary injunctive relief and the time the court took to decide the issue indicate that some flexibility in deadlines is equitable here. After considering the parties' written submissions, testimony, and argument on these matters, and the court now modifies the preliminary injunction to require as follows:

1. The requirement that plaintiff post bond of $1,000,000 as security for preliminary injunctive relief shall remain in effect, without increase in the amount required. As the court stated on March 26, 1999, if Abbott thought a larger bond was necessary, the time to present evidence was before the injunction was issued, not afterwards.

2. **No later than Friday, April 2, 1999,** Abbott Laboratories shall post on the Internet web site for its nutritional products group notice of this court's injunction, including the court's finding that Mead Johnson has shown a substantial likelihood of prevailing on its claim that the "1st Choice of Doctors" claim is deceptive and misleading in violation of the Lanham Act, and defendant shall delete from that site and other sites defendant controls other references to its "1st Choice of Doctors" claim, except as the claim applies to the Isomil brand. (Abbott has already complied with this portion of the order.)

3. **Beginning April 19, 1999,** Abbott Laboratories shall not include the claim "1st Choice of Doctors" on the labels and packaging for its Similac infant formula or any other infant formula (with the exception of the Isomil brand) in the United States for the following items: Similac 14.1 ounce size powder (high iron); Similac 13 ounce size concentrate (high and low iron); Similac 32 ounce size ready-to-feed plastic (high iron); Similac 8 ounce size ready-to-feed liquid can (high and low iron); Similac retail pouch (high iron). This provision shall not prevent Abbott Laboratories from selling or distributing labeled inventory of these items that Abbott Laboratories has on-hand as of April 19, 1999.

(The priority given to these high-volume items is consistent with the court's directives on March 26, 1999.)

4. **Beginning June 14, 1999,** Abbott Laboratories shall not include the claim "1st Choice of Doctors" on the labels and packaging for its Similac infant formula or any other infant formula (with the exception of the Isomil brand) in the United States in its 4 ounce and 2 ounce packages provided to hospitals and clinics. This provision shall not prevent Abbott Laboratories from selling or distributing labeled inventory of these items that Abbott Laboratories has on-hand as of June 14, 1999.

5. **Beginning June 7, 1999,** Abbott Laboratories shall not include the claim "1st Choice of Doctors" on the labels and packaging for its Similac infant formula or any other infant formula (with the exception of the Isomil brand) in the United States for any product items not covered by Paragraphs 3 and 4, above. This provision shall not prevent Abbott Laboratories from selling or distributing labeled inventory of the items covered by this paragraph that Abbott Laboratories has on-hand as of June 7, 1999.

6. Except as provided below in Paragraphs 8 and 9, **beginning April 19, 1999,** Abbott shall not distribute, mail, broadcast, or otherwise advertise in any medium in the United States its Similac infant formula or any other infant formula (with the exception of the Isomil brand) using the claim "1st Choice of Doctors."

7. Abbott Laboratories has filed with the court a list and copies of its so-called core advertising materials that exploit the "1st Choice of Doctors" claim. As to all such materials, Abbott Laboratories shall not distribute, mail, or otherwise use such materials in the United States beginning **Monday, April 12, 1999.**

8. Abbott shall be permitted to continue to distribute certain promotional items with a substantial educational content, even those items containing the "1st Choice of Doctors" claim, until current in-

ventory runs out. The items that are subject to this treatment are the following exhibits in Appendix A, filed with the court under seal on April 2, 1999: Exhibits 1 – 6; Exhibits 8 – 11; Exhibit 13; Exhibits 32 – 34; Exhibit 37; Exhibit 40.

9. Abbott shall be permitted to continue to distribute certain promotional items that make only incidental use of the "1st Choice of Doctors" claim through May 31, 1999. The items that are subject to this treatment are the following exhibits in Appendix C, filed with the court under seal on April 2, 1999: Exhibits 85 – 112; Exhibits 116 – 117; Exhibits 120 – 126. Also subject to this treatment are the following exhibits in Appendix A, filed with the court under seal on April 2, 1999: Exhibits 12; Exhibits 14 – 16; Exhibit 23. As to all Exhibits in Appendix A and Appendix C which are not mentioned in Paragraphs 8 or 9, the general prohibition on advertising using the "1st Choice of Doctors" claim applies beginning April 19, 1999. Abbott may, however, cover or "sticker" the "1st Choice of Doctors" claim if it wishes to continue distributing those materials already in its inventory.

10. This modified preliminary injunction supersedes the preliminary injunction issued in this action on March 18, 1999, and as modified on March 26, 1999. This modified preliminary injunction applies to defendant Abbott Laboratories, its officers, directors, employees, attorneys, and agents, and to other persons in active concert with Abbott Laboratories who have actual notice of this modified preliminary injunction.

11. Defendant Abbott Laboratories has requested clarification as to whether the preliminary injunction would prohibit use of the claims "First Choice of Doctors With a Preference" or "# 1 Doctor Preferred Among Those With a Preference." As the court stated in open court on March 26, 1999, neither the original preliminary injunction nor this modified preliminary injunction would prohibit use of those claims so long as the modifying phrase is not minimized. As to whether such claims would be deceptive or misleading, the court can say only that the record presented thus far would not show that either of these qualified claims would be deceptive or misleading in either of the two respects that the court found deceptive and misleading about the unqualified "1st Choice of Doctors" claim.

12. This modified preliminary injunction shall remain in effect pending further order of the court.

So ordered.